**FOURTH DIVISION**
**DILLARD, P. J.,**
**MERCIER and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**October 28, 2022**

# In the Court of Appeals of Georgia

A22A0834. CITY OF WINDER v. BARROW COUNTY.

MARKLE, Judge.

When Barrow County ("the County") and several municipalities within its jurisdiction reached an impasse regarding the approval of an update to their public service delivery strategy agreement, including the manner in which funds were collected for road maintenance and water services, the County sought resolution in the superior court, pursuant to OCGA § 36-70-25.1 (d). The City of Winder ("Winder") appeals from the court's orders on several motions, contending that the superior court erred by misinterpreting certain provisions of the Service Delivery Strategy Act ("the Act"), OCGA § 36-70-20 et seq., and by denying its motion to dismiss the County's claim that Winder's water rates for customers beyond its

municipal boundaries amount to an impermissible tax. For the reasons that follow, we affirm.

The Act requires local governments to develop strategy agreements for the provision and funding of public services to county and municipality residents in order "to minimize inefficiencies resulting from duplication of services and competition between local governments and to provide a mechanism to resolve disputes over local government service delivery, funding equity, and land use." OCGA § 36-70-20.

Under this framework, when the County and several local municipalities, including Winder, could not agree on revisions to the existing county service delivery strategy ("SDS") agreement,[1] they participated in several rounds of mediation. See OCGA § 36-70-25.1 (c).[2] Although the parties were able to resolve the large majority of their disputes, the County and Winder were unable to agree on two critical issues: funding for countywide road maintenance and Winder's provision of, and rates

_____

[1] As alleged in the petition, the original SDS agreement was adopted in 1999, and included a water service map that effactually divided the county into five territories, and designated an exclusive water provider — either the County, Winder, or the cities of Auburn, Braselton, or Statham — for each zone.

[2] OCGA § 36-70-25.1 (c) provides, in pertinent part: "If a county and the affected municipalities in the county are unable to reach an agreement on the strategy . . . , a means for facilitating an agreement through some form of alternative dispute resolution shall be employed."

2

assessed for, water utility service to unincorporated residents (i.e., county residents located beyond Winder's limits).

The County then filed its petition for judicial resolution pursuant to OCGA § 36-70-25.1 (d) (2),[3] raising four specific issues before the superior court: (1) whether the County was authorized to charge Winder residents for the maintenance of county-owned roads; (2) whether Winder impermissibly charged an arbitrary rate differential for water utility service based on customers' location within or beyond the city limits; (3) whether the County was authorized to provide water utility service to Winder's unincorporated customers; and (4) whether Winder's water charges amounted to an illegal tax on its unincorporated customers.

---

[3] OCGA § 36-70-25.1 (d) (1) (A) provides, in pertinent part: "In the event that the county and the affected municipalities in the county fail to reach an agreement . . . [t]he county or any affected municipality located within the county may file a petition in superior court of the county seeking mandatory mediation. Such petition shall be assigned to a judge . . . who is not a judge in the circuit in which the county is located.

OCGA § 36-70-25.1 (d) (2) provides, in pertinent part: "If no service delivery strategy has been submitted for verification to the Department of Community Affairs at the conclusion of the mediation, any aggrieved party may petition the superior court and seek resolution of the items remaining in dispute. The visiting or senior judge shall conduct an evidentiary hearing or hearings as such judge deems necessary and render a decision with regard to the disputed items."

3

The superior court ordered the parties to mediate these issues, but mediation proved unsuccessful. Winder then moved for partial summary judgment on the issue of road funding, essentially contending that, under its reading of OCGA § 36-70-24 (3)(A), the geographic location of the roads determined which county residents could be charged for their maintenance. The County filed a cross-motion for summary judgment on this issue, claiming that road funding was dependent on who used the service — as opposed to the geographical location of the road. Thereafter, Winder filed a second motion for partial summary judgment, contending that the County's sources of revenue to fund services for the unincorporated areas were limited solely to those enumerated under OCGA § 36-70-24 (3) (B). In addition, Winder filed a motion to dismiss the County's claim regarding the alleged illegal tax, contending that it was beyond the scope of this statutory proceeding.

Following a hearing, the trial court denied Winder's motions, but granted the County's motion for partial summary judgment on the road funding issue.[4] This appeal followed.

1. Winder first argues the superior court erred by denying its motion for partial summary judgment, and granting the County's cross-motion, on the issue of road funding because the court misinterpreted OCGA § 36-70-24 (3) (A). Essentially, Winder contends that the Act prohibits the County from charging city residents for the maintenance of countywide roads that are located beyond the city limits; whereas the County contends the issue turns on usage as opposed to geographical location. We conclude the trial court properly interpreted the statute.

> This Court reviews de novo a grant or denial of summary judgment, viewing the evidence and all reasonable conclusions and inferences drawn from it in the light most favorable to the nonmovant. Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Further,

---

[4] This appeal is a direct appeal from a grant of partial summary judgment. OCGA § 9-11-56 (h). Although this case remains pending for resolution below, "when a direct appeal is taken, any other judgments, rulings or orders rendered in the case and which may affect the proceedings below may be raised on appeal and reviewed and determined by the appellate court." *Sotter v. Stephens*, 291 Ga. 79, 84 (727 SE2d 484) (2012); see also OCGA § 5-6-34 (d); *Dierkes v. Crawford Orthodontic Care*, 284 Ga. App. 96, 98 (1) (643 SE2d 364) (2007).

the interpretation of a statute is a question of law, which is reviewed de novo on appeal.

(Citations and punctuation omitted.) *Ridgewalk Holdings v. Atlanta Apartment Investment Corp.*, 358 Ga. App. 717, 719 (856 SE2d 75) (2021).

Additionally,

[o]ur interpretation and application of statutory language is guided by the following principles: A statute draws its meaning, of course, from its text. Under our well-established rules of statutory construction, we presume that the General Assembly meant what it said and said what it meant. To that end, we must afford the statutory text its plain and ordinary meaning, we must view the statutory text in the context in which it appears, and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would. Though we may review the text of the provision in question and its context within the larger legal framework to discern the intent of the legislature in enacting it, where the statutory text is clear and unambiguous, we attribute to the statute its plain meaning, and our search for statutory meaning ends.

(Citations omitted.) *Stockton v. Shadwick*, 362 Ga. App. 779, 782-783 (1) (a) (870 SE2d 104) (2022). With these guiding principles in mind, we turn to the merits of Winder's arguments.

6

Winder argues that the plain language of OCGA § 36-70-24 (3) (A) supports its contention that its residents are excluded from paying for countywide road maintenance beyond its city limits. We disagree.

OCGA § 36-70-24 addresses certain criteria that must be considered in the development of a service delivery strategy. Specifically, OCGA § 36-70-24 (3) (A) provides:

> The strategy shall ensure that the cost of any service which a county provides primarily for the benefit of the unincorporated area of the county shall be borne by the unincorporated area residents, individuals, and property owners who receive the service. Further, when the county and one or more municipalities jointly fund a county-wide service, the county share of such funding shall be borne by the unincorporated residents, individuals, and property owners that receive the service.

In its reading of this provision, Winder emphasizes the phrase "any service which a county provides *primarily for the benefit of the unincorporated area.*" OCGA § 36-70-24 (3) (A) (Emphasis supplied.). Under Winder's interpretation of this phrase, if a road requires maintenance in the unincorporated area, it necessarily follows that the road maintenance service primarily benefits those residing in the unincorporated area (who are then solely responsible for bearing the costs of its upkeep because they "receive the service"). Id.

7

By its proposed interpretation, the City attempts to dissociate usage (i.e., who uses the roads) from the term "benefit" in OCGA § 36-70-24 (3) (A). But these concepts are inextricably intertwined. The noun "benefit" is generally defined as "something that produces good or helpful results . . .; useful aid." Merriam-webster.com/dictionary/benefit (last visited October 17, 2022); see *Catoosa County v. Rome News Media*, 349 Ga. App. 123, 128 (825 SE2d 507) (2019) ("Except when considering a technical term or term of art in a particular industry, Georgia courts often begin by considering how a word has been defined in dictionaries to determine its plain and ordinary meaning."). And the transitive verb "to benefit" is generally defined as "to be useful or profitable to." Merriam-webster.com/dictionary/benefit (last visited October 17, 2022) (as in "tax cuts that primarily *benefit* the wealthy") (emphasis in original). Thus, Winder's proposed statutory interpretation is unreasonable. See *Stockton*, 362 Ga. App. at 782 (1) (a) ("we must read the statutory text in its most natural and reasonable way") (citations omitted).

County roads, regardless of their specific geographic location, benefit *all* residents of the county — as does their upkeep. See generally *DeKalb County v. City of Decatur*, 247 Ga. 695, 697 (2) (279 SE2d 427) (1981) ("County taxpayers residing in municipalities enjoy the use of DeKalb County parks, roads and other facilities,

8

and the protection of the DeKalb County police, while they are going about their business or enjoying their leisure time outside the boundaries of the municipalities in which they reside.").[5] Under the plain language of the Code section above, because the county roads do not *primarily* benefit the unincorporated area, unincorporated residents are not solely burdened with the costs of their upkeep.[6] OCGA § 36-70-24 (3) (A).

Our broader reading of this provision comports with the codified intent of the Act, "to provide a flexible framework within which local governments in each county can develop a service delivery system that is both efficient and responsive to *citizens in their county*. OCGA § 36-70-20. As the County correctly argued, the focus of the Act is not on the geographical location of the public service, but on who uses (and

---

[5] Although *DeKalb County* predates the effective date of the Act, "we presume that statutes are enacted by the legislature with full knowledge of the existing condition of the law and with reference to it. They are therefore to be construed in connection and in harmony with the existing law." (Citation and punctuation omitted.) *Dept. of Pub. Safety v. Ragsdale*, 308 Ga. 210, 213 (839 SE2d 541) (2020); see also Ga. L. 1997, p. 1567, § 1.

[6] Winder contends that the superior court improperly focused its analysis on the second sentence of OCGA § 36-70-24 (3) (A). Even so, our review is de novo and we affirm a judgment that is right for any reason. *Hardin v. Hardin*, 301 Ga. 532, 537 (801 SE2d 774) (2017) ("Appellate courts, however, retain discretion to apply the 'right for any reason' rule on de novo review and consider alternative legal theories or analysis not relied on by the trial court on summary judgment.").

9

thus *benefits*) from the service. See OCGA § 36-70-24 (3) (A). Thus, the superior court was correct in granting summary judgment to the County on the issue of road funding under the plain language of this Code section.[7]

2. Winder next argues that the superior court erred by denying its second motion for partial summary judgment, regarding the viable sources of funding for countywide services, because the court misconstrued OCGA § 36-70-24 (3) (B). Again, we disagree.

OCGA § 36-70-24 (3) (B) provides:

------

[7] To the extent Winder argues that this reading of OCGA § 36-70-24 (3) (A) conflicts with the Supplementary Powers clause of the Georgia Constitution, this argument fails. That clause prohibits a county from providing certain services, including street and road construction and maintenance inside the boundaries of a municipality, and is not invoked here where the County's maintenance of unincorporated roads is at issue. Ga. Const. of 1983, Art. IX, Sec. II, Par. III (a) (4), (b). Nor are we persuaded by Winder's speculative concern that our interpretation of the statute permits the County "to tax anyone anywhere in the county for a service even though it is provided primarily for the benefit of the unincorporated area." This division addresses countywide road funding only. Because we have rejected Winder's premise that countywide road maintenance is "primarily for the benefit of the unincorporated area," it would be inequitable — as well as contrary to the language of OCGA § 36-70-24 (3) (A) — for the unincorporated residents to shoulder the entire cost of the service. See also OCGA § 32-4-41 (1), (2) (recognizing municipal funds as a potential funding source for the management and maintenance of a countywide road system). Finally, in light of our decision above, we need not reach the County's argument that our interpretation comports with the Uniformity Clause of the Georgia Constitution, Ga. Const. of 1983, Art. VII, Sec. I, Par. III (a).

10

Such funding shall be derived from special service districts created by the county in which property taxes, insurance premium taxes, assessments, or user fees are levied or imposed or through such other mechanism agreed upon by the affected parties which complies with the intent of subparagraph (A) of this paragraph[.]

Winder contends that the four enumerated sources of revenue listed in this Code section are the sole sources a county may draw on to fund services that are deemed primarily for the benefit of the unincorporated area or are jointly funded by a county and a municipality under OCGA § 36-70-24 (3) (A). The County disagrees, contending that OCGA § 36-70-24 (3) (B) does not limit funding for such services to those four discrete items; rather it merely requires counties to form special service districts and then references general funding categories that are permitted within such districts.[8]

Construing the plain language of OCGA § 36-70-24 (3) (B), the County's interpretation of this statute is the most natural and reasonable. *Stockton*, 362 Ga.

---

[8] The County further contends that Winder's interpretation would redirect any tax or fee payments made by unincorporated residents in special districts that cannot be classified under any of the four categories listed in OCGA § 36-70-23 (3) (B) to the County's general fund; thus, reducing the tax rate on municipal taxpayers at the expense of the unincorporated ones.

App. at 782-783 (1) (a). Under our reading of this Code section, when OCGA § 36-70-24 (3) (A) applies to a public service, the funding for such service must "derive from" a special service district.[9] OCGA § 36-70-24 (3) (B). In that special district, property taxes, insurance premium taxes, assessments or user fees are to be imposed or levied. Id. But nowhere in OCGA § 36-70-24 (3) (B) is a county directed to specifically apply these revenue sources to fund the service.

Importantly, OCGA § 36-70-24 (3) (B) does not specify the nature of the user fees or assessments, or whether they necessarily arise from the given public service; these are general categories. Although Winder urges us to interpret the term "assessments" in OCGA § 36-70-24 (3) (B) as "special assessments" designated for a specific purpose, this Code section includes no such qualifier, and we may not rewrite the statute in this manner. *Harris v. Mahone*, 340 Ga. App. 415, 422 (797 SE2d 688) (2017) ("[T]his Court does not have the authority to rewrite statutes.") (citation and punctuation omitted). We thus reject Winder's contention that the list of revenue sources set forth in OCGA § 36-70-24 (3) (B) identifies the sole means by

---

[9] The Georgia Constitution authorizes the formation of special districts "for the provision of local government services within such districts; and fees, assessments and taxes may be levied and collected within such districts to pay, wholly or partially, the cost of providing such services[.]" Ga. Const. of 1983, Art. IX, Sec. II, Par. VI.

12

which the County may fund a public service under OCGA § 36-70-24 (3) (A). As such, the trial court properly denied Winder's motion for summary judgment on this issue.[10]

3. Winder next contends that the trial court erred by denying its motion to dismiss the County's claim that Winder's water usage rates amounted to an illegal tax on its unincorporated water customers. We address Winder's specific arguments in turn, and conclude that the trial court did not err.

> A motion to dismiss for failure to state a claim should not be sustained unless (1) the allegations of the complaint disclose with certainty that the claimant would not be entitled to relief under any state of provable facts asserted in support thereof; and (2) the movant establishes that the claimant could not possibly introduce evidence within the framework of the complaint sufficient to warrant a grant of the relief sought. Where, as here, a case turns on statutory interpretation and resolution of questions of law, we apply a de novo standard of review.

(Citations omitted.) *Stockton*, 362 Ga. App. at 780.

---

[10] Winder complains that the superior court applied a factual analysis to this legal issue. Regardless, we affirm a judgment that is right for any reason. *Hardin*, 301 Ga. at 537.

(a) Winder first argues that the trial court lacked authority to resolve this issue because OCGA § 36-70-25.1 (d) does not permit a trial court to issue an injunction or grant declaratory relief. This argument is unavailing.

Once a petition for judicial resolution has been properly filed, OCGA § 36-70-25.1 (d) (2) authorizes the superior court to "conduct an evidentiary hearing . . . as such judge deems necessary and render a decision with regard to the disputed items." That section further provides that the court, in its discretion, may impose or hold in abeyance the statutory sanctions under OCGA § 36-70-27 (a); use its contempt powers to ensure compliance with its decision; and impose costs if it determines a party has acted in bad faith. Id. Thus, although OCGA § 36-70-25.1 (d) (2) limits the *remedies* a court may impose, it places no such restriction on the "disputed items" the court is directed to resolve.[11]

Moreover, nothing in the Act prohibits the trial judge from determining whether or not a charge for services amounts to an impermissible tax. Importantly,

[11] Notably, in its petition, the County sought neither an injunction nor declaratory relief. We further note that, as the superior court has not issued injunctions against any party, nor directed "particular funding for services" related to this issue, Winder's reliance on *City of Union Point v. Greene County*, 303 Ga. 449, 459 (2) (812 SE2d 278) (2018), disapproved on other grounds by *City of College Park v. Clayton County*, 306 Ga. 301, 313 (2), n. 7 (830 SE2d 179) (2019), is misguided.

OCGA § 36-70-24 (2) (A) specifically provides that "water or sewer fees charged to customers located outside the geographic boundaries of a service provider shall not be arbitrarily higher than the fees charged to customers receiving such service which are located within the geographic boundaries of the service provider." OCGA § 36-70-24 (2) (B) then sets forth a method for resolving "disputes [over] the reasonableness of water and sewer rate differentials," including alternative dispute resolution. These Code sections do not preclude the trial court's consideration, as Winder insists; rather, they demonstrate that water rate issues may become "disputed items" left for the superior court to resolve. OCGA § 36-70-25.1 (d) (2); see *Lathan v. Hosp. Auth. of Charlton County*, 343 Ga. App. 123, 128 (1) (805 SE2d 450) (2017) ("A statute must be construed in relation to other statutes of which it is a part, and all statutes relating to the same subject-matter, briefly called statutes 'in pari materia,' are construed together, and harmonized wherever possible[.]") (citation omitted).

We are also not persuaded by Winder's contention that the trial court lacked subject matter jurisdiction to consider this claim, nor by its claim that the trial court failed to consider its motion to dismiss under OCGA § 9-11-12 (b) (1).[12] As we have

[12] To the extent Winder contends the County failed to preserve this claim for appeal, this argument is disingenuous. The record shows that the County raised this issue as early as the first round of mediation between the parties.

explained, "the question of whether a plaintiff has a cause of action under a particular statute is an ordinary issue of statutory interpretation, not a jurisdictional question. . . . The scope of a statutory cause of action, then, is not an appropriate inquiry to consider on a OCGA § 9-11-12 (b) (1) motion to dismiss." *Stillwell v. Topa Ins. Co.*, 363 Ga. App. 126, 131 (1) (871 SE2d 8) (2022).

Accordingly, under our construction of the plain language of the Act, the trial court is authorized to consider this claim as a disputed item under OCGA § 36-70-25.1 (d) (2).

(b) Winder next argues that this claim is precluded by binding case law that holds water usage charges are not taxes, and that nonresidents lack standing to challenge how water charges are spent. This argument is unavailing.

First, we note that the cases cited by Winder predate the Act. See, e.g., *City of Moultrie v. Burgess*, 212 Ga. 22 (90 SE2d1) (1955)*; Messenheimer v. Windt*, 211 Ga. 575 (87 SE2d 402) (1955); *Alford v. City of Eatonton*, 174 Ga. 169 (162 SE 495) (1932); see also *City of Union Point*, 303 Ga. at 449 (noting the Act became effective in 1997); Ga. L. 1997, p. 1567, § 1. Importantly, the Act implicitly acknowledges a governing authority's standing to challenge water charges assessed in its jurisdiction

16

by another governing authority, as the County does here. See OCGA § 36-70-24 (2) (B).

Second, none of the cases relied on by the City establish a bright line rule that water fees may never amount to an illegal tax. See, e.g., *Alford*, 174 Ga. at 169 (2) ("The question of uniformity in taxation is therefore not presented."); *Messenheimer*, 211 Ga. at 578 (1) (noting without further analysis that, because the petitioners were not residents of the city, the water fees they paid to the city did not amount to taxes). This argument is thus without merit, and the superior court did not err in denying the City's motion to dismiss this claim.[13]

*Judgment affirmed. Mercier, J., concurs. Dillard, P. J., dissents.*

---

[13] To the extent that both parties argue the merits of whether Winder's water usage rates amount to an illegal tax, these arguments are premature, as the superior court has not yet ruled on this issue. See *Pneumo Abex v. Long*, 357 Ga. App. 17, 29 (2) (849 SE2d 746) (2020) ("As we have repeatedly explained, this is a Court for the correction of errors of law, and if the trial court has not ruled on an issue, we will not address it.") (citations and punctuation omitted). By our ruling above, we make no comment as to the resolution of this issue that is rightly before the superior court.

# In the Court of Appeals of Georgia

A22A0834. CITY OF WINDER v. BARROW COUNTY.

DILLARD, Presiding Judge, dissenting.

I respectfully dissent from the majority's opinion and would reverse the trial court as to each of the City's enumerated errors.

1. I begin by considering the meaning and application of the Service Delivery Strategy Act; and my analysis necessarily begins with the settled principles by which courts discern statutory meaning.

2

A statute "draws its meaning from its text,"[1] and that meaning is fixed at the moment of its enactment.[2] Importantly, an appellate court must presume "the General Assembly meant what it said and said what it meant,"[3] and "read the statutory text in

---

[1] *City of Marietta v. Summerour*, 302 Ga. 645, 649 (2) (807 SE2d 324) (2017) (punctuation omitted); *see Hendry v. Hendry*, 292 Ga. 1, 2-3 (734 SE2d 46) (2012) (explaining that "[w]hen we consider the meaning of a statute, we look first to the text of the statute, and if the text is clear and unambiguous, we look no further, attributing to the statute its plain meaning," and that "as we look to the words of a statute, we attribute to those words their ordinary, logical, and common meanings, unless a clear indication of some other meaning appears" (citations and punctuation omitted)); *Morris v. Real Est. Expert Advisors, LLC*, 355 Ga. App. 286, 293-94 (844 SE2d 227) (2020) ("In interpreting any statute, we necessarily begin by considering familiar and binding canons of construction. And in construing the meaning of a statute, our charge is to presume that the General Assembly meant what it said and said what it meant. To that end, we must afford the statutory text its plain and ordinary meaning, consider the text contextually, read the text in its most natural and reasonable way, as an ordinary speaker of the English language would, and seek to avoid a construction that makes some language mere surplusage. So, when the language of a statute is plain and susceptible of only one natural and reasonable construction, courts must construe the statute accordingly.") (cleaned up); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 16 (1st ed. 2012) ("Textualism, in its purest form, begins and ends with what the text says and fairly implies.").

[2] *Undisclosed LLC v. State*, 302 Ga. 418, 428 (807 SE2d 393) (2017); *see also Warren v. State*, 294 Ga. 589, 590 (1) (755 SE2d 171) (2014) ("[W]e look to the ordinary meaning of those words at the time the General Assembly enacted the statute . . . .").

[3] *Deal v. Coleman*, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013) (punctuation omitted); *accord Holcomb v. Long*, 329 Ga. App. 515, 517 (1) (765

3

its most natural and reasonable way, as an ordinary speaker of the English language would."[4] In doing so, we look to "the common and customary usages of words," especially "as used in a legal context."[5] Additionally, we may consider the standard rules of English grammar to aid us in understanding the relevant statutory text.[6] And context is, of course, a "primary determinant of meaning."[7] So, when the meanings of words are uncertain, the other words appearing in the same statutory provision can

_____

SE2d 687) (2014).

[4] *Deal*, 294 Ga. at 172-73 (1) (a); *accord Holcomb*, 329 Ga. App. at 517 (1).

[5] *Fed. Deposit Ins. Corp. v. Loudermilk*, 305 Ga. 558, 562 (826 SE2d 116) (2019) (punctuation omitted); *see also* OCGA § 1-3-1 (b) ("In all interpretations of statutes, the ordinary signification shall be applied to all words . . . .").

[6] *See Deal*, 294 Ga. at 173 (1) (a) ("[C]ourts sometimes refer to the rules of English grammar inasmuch as those rules are the guideposts by which ordinary speakers of the English language commonly structure their words, and the legislature is presumed to know the rules of grammar." (citation and punctuation omitted)); *see also Monumedia II, LLC v. Dep't of Transportation*, 343 Ga. App. 49, 53 (806 SE2d 215) (2017) (applying rules of English grammar to interpret statutory text).

[7] *May v. State*, 295 Ga. 388, 391 (761 SE2d 38) (2014) (punctuation omitted); *see Deal*, 294 Ga. at 172 (1) (a) ("[W]e must view the statutory text in the context in which it appears[.]"); *DeKalb Cnty. Bd. of Tax Assessors v. Barrett*, 361 Ga. App. 598, 600 (865 SE2d 192) (2021) (noting that "we must afford the statutory text its plain and ordinary meaning" and "consider the text contextually . . . ."); *see also Scherr v. Marriott Int'l, Inc.*, 703 F3d 1069, 1077 (II) (C) (2) (7th Cir. 2013) (Manion, J.) ("In statutory construction cases, we begin with the language of the statute itself and the specific context in which that language is used." (citation and punctuation omitted)).

4

inform their meaning;[8] and we may also "construe statutes in connection and in harmony with the existing law, and as a part of a general and uniform system of jurisprudence."[9] With these guiding principles in mind, I turn now to the text and context of the statute at issue.

The Service Delivery Strategy Act seeks to "minimize inefficiencies resulting from duplication of services and competition between local governments[.]"[10] And to accomplish this goal, the Act directs each county and its municipal governments to reach an agreement about the geographic areas in which each government will provide particular services, as well as the means by which to fund those services.[11]

---

[8] *See Dep't of Comm. Health v. Northside Hosp.*, 295 Ga. 446, 450 (761 SE2d 74) (2014). The consideration of immediate context is often informed by familiar canons of construction, including *noscitur a sociis* and *ejusdem generis*. *See, e.g.*, *Kinslow v. State*, 311 Ga. 768, 773-74 (860 SE2d 444) (2021) (noting that "several canons of construction address[ ]the importance of examining the context in which a word appears").

[9] *Langley v. State*, 313 Ga. 141, 143-44 (868 SE2d 759) (2022) (punctuation omitted); *accord In the Interest of M. D. H.*, 334 Ga. App. 394, 396 (2) (779 SE2d 433) (2015).

[10] OCGA § 36-70-20.

[11] *See* OCGA § 36-70-20 ("The local government service delivery process should result in . . . a simple, concise agreement describing which local governments will provide which service in specified areas within a county and how provision of such services will be funded.").

5

More specifically, the Act requires the various governments in each county to agree upon a "local government service delivery strategy," which includes

(1)  An identification of all local government services presently provided or primarily funded by each general purpose local government and each authority within the county, or providing services within the county, and a description of the geographic area in which the identified services are provided by each jurisdiction;

(2)  An assignment of which local government or authority, pursuant to the requirements of this article, will provide each service, the geographic areas of the county in which such services are to be provided, and a description of any services to be provided by any local government to any geographic area outside its geographical boundaries. In the event two or more local governments within the county are assigned responsibility for providing identical services within the same geographic area, the strategy shall include an explanation of such arrangement;

(3)  A description of the source of the funding for each service identified pursuant to paragraph (2) of this Code section; and

(4)  An identification of the mechanisms to be utilized to facilitate the implementation of the services and funding responsibilities identified pursuant to paragraphs (2) and (3) of this Code section.[12]

---

[12] OCGA § 36-70-23.

6

The Service Delivery Strategy Act, then, prescribes certain criteria that a service delivery strategy must satisfy, including that it must "promote the delivery of local government services in the most efficient, effective, and responsive manner."[13] And with respect to "any service which a county provides *primarily* for the benefit of the unincorporated *area* of the county,"[14] the strategy must ensure the service cost is "borne by the unincorporated area residents, individuals, and property owners who receive the service."[15]

Here, the parties dispute whether the construction and maintenance of the Barrow County road system is a service that is "primarily for the benefit of the unincorporated area of the county" within the meaning of OCGA § 36-70-24 (3) (A). The superior court concluded the construction and maintenance of Barrow County roads is *not* a service primarily for the benefit of the unincorporated area of the county, and the majority agrees with this interpretation of the statute. I do not.[16]

---

[13] OCGA § 36-70-24 (1).

[14] (Emphasis supplied).

[15] OCGA § 36-70-24 (3) (A).

[16] It appears to be undisputed that the Barrow County road system at issue lies predominantly within the unincorporated area of the county. And as explained by the City of Valdosta's amicus brief, it is *not* inevitable that every county road system will lie entirely or even predominantly within a county's unincorporated area. Indeed,

7

For starters, the "primary benefit" clause of OCGA § 36-70-24 (3) (A) categorically requires a geographic inquiry, providing, *inter alia*, that "[t]he strategy shall ensure that the cost of any service which a county provides primarily for the benefit of the unincorporated area of the county shall be borne by the unincorporated area residents, individuals, and property owners who receive the service."[17] In its

_____

every public road is a part of either the state highway system, the county road system, or a municipal street system. *See* OCGA § 32-4-1. And a county's road system consists of "those public roads within that county, including county roads extending into any municipality within the county, which are shown to be a part of that county road system by the [state Department of Transportation] records." OCGA § 32-4-1 (2). In some counties, a substantial part of the county road system may lie within the boundaries of one or more municipalities. As a result, even if we were to reverse the trial court's judgment in this case, it would not necessarily establish a categorical rule that the construction and maintenance of a county road system is always primarily for the benefit of an unincorporated area.

I thank each of the amici for their thoughtful and helpful briefs in this case.

[17] OCGA § 36-70-24 (3) (A).

ordinary sense, "area" refers to geography, not people.[18] Furthermore, a "benefit" may flow to a person, thing, activity, or *place*[19]—which is also true in Georgia law.[20]

OCGA § 36-70-24 (3) (A) also describes the subjects of the distinct determinations differently. Indeed, the initial determination references *geography* ("the unincorporated area of the county"), and the subsequent determination references *people* ("the unincorporated area residents, individuals, and property owners who receive the service"). This further highlights that the *initial* determination is distinctly *geographic* in nature.[21]

---

[18] *See* OXFORD ENGLISH DICTIONARY (3rd ed. 2015) ("A region with vaguely defined boundaries, considered as a unit on the basis of its character, inhabitants, geography, or relative location."); *see also* RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY (2d ed. 2001) at 71 ("a geographic region"); WEBSTER'S THIRD NEW INTL. DICTIONARY (1971) at 115 ("an expanse or tract of the earth's surface" or "a section, district, or zone of a town or city"); WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1989) at 101 ("a particular extent of space or surface or one serving a special function").

[19] *See* Bryan A. Garner, A Dictionary of Modern American Usage at 80 (to illustrate usage of "benefit," citing article about how "the Digital/Microsoft Alliance" would "benefit" the launch of certain Intel-based software).

[20] *See, e.g.*, *Emson Inv. Props. v. JHJ Jodeco 65*, 349 Ga. App. 644, 647 (2) (824 SE2d 113) (2019) ("A quasi-easement arises when the owner of an entire tract uses one part of the tract for the benefit of another [part of the tract] . . . .").

[21] *See Pandora Franchising v. Kingdom Retail Group*, 299 Ga. 723, 728 (1) (b) (791 SE2d 786) (2016) ("Where the legislature uses certain language in one part of the statute and different language in another, the Court assumes different meanings

9

And for purposes of OCGA § 36-70-24 (3) (A), the dispositive element is the geographic area a service *benefits* and *not* the place where the service is performed. To be sure, some government services are performed at centralized locations to benefit a wider area (*e.g.*, courthouses, libraries, parks, recreation centers, art and science facilities, public hospitals); but other government services are distributed across wide areas (*e.g.*, police and fire protection, garbage and solid-waste collection and disposal, storm-water and sewage collection and disposal, water distribution, construction and maintenance of public roads). Thus, the geographic area a service *benefits* is crucial to the assessment required under the statute.

---

were intended." (punctuation omitted)). This interpretation is consistent with the constitutional law not-so-subtly lurking in the background of the statute. The Georgia Constitution authorizes every county and municipality to provide certain enumerated services, including construction and maintenance of roads. *See* Ga. Const. of 1983, Art. IX, Sec. II, Para. III (a). But it limits this authority in *geographic* terms. No county may provide the enumerated services within the boundaries of any municipality—and no municipality may provide such services beyond its own boundaries—unless otherwise authorized by law or under an intergovernmental agreement with any other affected jurisdiction. *See* Ga. Const. of 1983, Art. IX, Sec. II, Para. III (b). The Georgia Constitution also permits county and municipal governments to establish "special districts" for "the provision of local government services within such districts," as well as to levy and collect fees, assessments, and taxes "within such districts to pay, wholly or partially, the cost of providing such services therein." Ga. Const. of 1983, Art. IX, Sec. II, Para. VI.

Additionally, the initial determination under OCGA § 36-70-24 (3) (A) requires the identification of the geographic area that receives not just *any* benefit from a particular service but the *primary* benefit.[22] In some sense, the entirety of a county—and for that matter, all of our state and country—benefits from well constructed and maintained public roads. But in a geographic sense (which is contemplated by the plain meaning of the statute), a road system *primarily* benefits the places to which it provides direct, immediate access.[23] As a result, the construction and maintenance of a county road system that is entirely or

---

[22] If *any* benefit, no matter how nominal, were dispositive of the initial determination under OCGA 36-7-24 (3) (A), the entire provision would be effectively rendered meaningless. The whole county, in some sense, benefits from police and fire protection, garbage and solid-waste collection and disposal, the provision of public health services, street and road construction and maintenance, parks and recreational services, storm-water and sewage collection and disposal, water distribution, public housing, public transportation, library and cultural services, and the enforcement of zoning, building, housing, plumbing, and electrical codes in any part of the county. But attenuated benefits do not render OCGA § 36-70-34 (3) (A) meaningless *precisely because* only *primary* benefits are to be considered under the statute.

[23] *Cf. Evans v. State,* 312 N.Y.S.2d 821, 822 (N.Y. App. Div. 1970) (acknowledging in eminent domain case that "primary benefit" of public road is commonly enjoyed by "those property owners whose property abuts it").

11

predominantly within a county's unincorporated—which appears to be undisputed in this case[24]—is a service *primarily* for the benefit of that unincorporated area.[25]

In reaching the opposite conclusion, the majority relies on *DeKalb County v. City of Decatur*,[26] which predates both the Act and the Constitution of 1983. *DeKalb County* concerns the interpretation and application of a local constitutional amendment, which established special services tax districts in DeKalb County and directed the county to assess, levy, and collect taxes and fees in each district "in accordance with the kind, character, type and degree of district services provided by the county within such special services tax district."[27] This local amendment does not appear to have contemplated the area that particular services *primarily* benefitted, which is the very determination the Act plainly requires.[28] Moreover, the local

_____

[24] *See supra* note 16.

[25] I am also unpersuaded by the suggestion that the initial determination under OCGA § 36-70-24 (3) (A)—*i.e.*, whether a service is "primarily for the benefit of the unincorporated area of the county"—requires assessment of *who* drives upon the county roads. As explained *supra*, the plain language of the statute requires a geographic assessment of the *area* a service primarily benefits, *not* the people it benefits.

[26] 247 Ga. 695 (279 SE2d 427) (1981).

[27] 247 Ga. at 695-96.

[28] *See id.*

12

amendment at issue in *DeKalb County* did not strictly limit the funding of services provided primarily for the benefit of a particular special district to revenues raised within that district, unlike the Act before us.[29] Accordingly, *DeKalb County* does not properly inform the meaning of OCGA § 36-70-24 (3) (A).

For all these reasons, I would reverse the trial court's grant of summary judgment on this issue.

2. I also disagree with the majority's interpretation of "assessments" as used in OCGA § 36-70-24 (3) (B), which provides that the funding of services provided by a county primarily for the benefit of the unincorporated area "shall be derived from special service districts created by the county in which property taxes, insurance premium taxes, assessments, or user fees are levied or imposed or through such other mechanism agreed upon by the affected parties."[30] The majority concludes that "assessments" means revenue measures of every kind, by which a county may then

---

[29] *See id.* at 697 ("Neither does the local amendment expressly and distinctly state in its body that only those properties located within the boundaries of [the special districts] shall be made liable for the payment of ad valorem taxes to support district services provided within special services tax districts.").

[30] OCGA § 36-70-24 (3) (B).

13

use *any* source of revenue to fund these services, so long as the revenue is collected from the unincorporated part of the county. Again, I disagree.

Contrary to the majority's conclusion, OCGA § 36-70-24 (3) (B) specifically identifies four particular revenue measures—*i.e.*, ad valorem property taxes, insurance premium taxes, assessments, and user fees—that may be used to fund the relevant services. This list is exhaustive. "Property taxes," "insurance premium taxes," and "user fees" unambiguously refer to certain and specific revenue measures, and under the canon of *noscitur a sociis*, "assessments" must likewise refer to a particular revenue measure or a class of revenue measures.[31] And when "assessment"

---

[31] *See Warren*, 294 Ga. at 590-91 (1) ("Under the canon of *noscitur a sociis*, the words in [a statute] should be understood in relation to each other, since words, like people, are judged by the company they keep." (punctuation omitted)); *Montgomery Cnty. v. Hamilton*, 337 Ga. App. 500, 508 n.23 (788 SE2d 89) (2016) (noting that "under the canon of noscitur a sociis, the words in a statute should be understood in relation to each other, since words, like people, are judged by the company they keep.") (cleaned up); *Arroyo Ditch & Water Co. v. Superior Ct. of Los Angeles Cnty.*, 28 P54, 55 (Ca. 1891) ("The other words in the clause, in connection with which the term is associated, serve to illustrate its meaning, and resolve any doubt that might otherwise be raised respecting the sense in which it is to be interpreted. Each of these subjects, viz., tax, impost, toll, municipal fine . . . implies a charge imposed by public authority for some public purpose, and, under the rules by which the maxim *noscitur a sociis* is applied, it is clear that the 'assessment' referred to is of a kindred nature.").

is used in this way, it is most commonly understood to refer to a "special assessment."[32]

Furthermore, if "assessments" were understood to mean revenue measures of any kind, the specific inclusion of other revenue measures in OCGA § 36-70-24 (3) (B)—*i.e.*, property taxes, insurance premium taxes, and user fees—would be mere surplusage. And the subsequent reference to "such other mechanism agreed upon by the affected parties" would be entirely unnecessary if "assessments" meant any revenue measure. But it is well established that "courts must seek to avoid a

---

[32] *See* BLACK'S LAW DICTIONARY (6th ed. 1990) at 116 (explaining that a "special assessment" generally refers to a revenue measure for a specific purpose levied "upon property according to benefits conferred on the property"); *see also Hayden v. City of Atlanta*, 70 Ga. 817, 822-23 (1884) ("Taxes are different from assessments for local improvements, taxes being burdens upon all persons and property alike, and compensated for by equal protection to all, while assessments are not burdens but equivalents, and are laid for local purposes upon local objects, and are compensated for to some extent in local benefits and improvements, enhancing the value of the property assessed. Taxes are imposed on the person, assessments are imposed on the property."). Of course, "assessment" is sometimes used in a tax context to refer to things other than revenue measures. For example, "assessment" sometimes refers to "[t]he listing and valuation of property for the purpose of apportioning a tax upon it," and in other instances to a determination of "the share of a tax to be paid by each of many persons." BLACK'S LAW DICTIONARY (6th ed. 1990) at 116-17. But understanding that "assessments" is used in OCGA § 36-70-24 (3) (B) to refer to a revenue measure *excludes* the other senses in which "assessment" can be used in a tax context.

15

construction that makes some language of a statute mere surplusage."[33] Suffice it to say, "assessments" is most reasonably understood to refer to "special assessments" in this statutory context, which is an understanding that properly attaches meaning to every word of this statutory provision.[34] Accordingly, I would reverse the trial court's grant of summary judgment on this question as well.

3. Finally, I disagree with the majority's conclusion that the trial court properly denied the City's motion to dismiss when, in its amended petition under the Act, the County sought a declaratory judgment that the City's use of revenue earned from the sale of municipal water for general revenue purposes is an "illegal tax" collection. Setting aside the merits of this claim, the Act does not authorize such a declaratory judgment.

---

[33] *Lucas v. Beckman Coulter, Inc.*, 303 Ga. 261, 263 (811 SE2d 369) (2018); *accord Holcomb*, 329 Ga. App. at 518 (1); *State of Ga. v. Free At Last Bail Bonds*, 285 Ga. App. 734, 737 (647 SE2d 402) (2007).

[34] This understanding is also consistent with the Georgia Constitution. Article IX, Section II, Paragraph VI of the Georgia Constitution of 1983 provides that "special districts may be created for the provision of local government services within such districts[,] and fees, assessments, and taxes may be levied and collected within such districts to pay, wholly or partially, the cost of providing such services therein." So, as used in the Georgia Constitution, "assessments" does not refer to revenue measures of every kind, which would render the constitutional references to "fees" and "taxes" mere surplusage.

16

The Service Delivery Strategy Act prescribes certain criteria that a service delivery strategy must satisfy, including that it must "promote the delivery of local government services in the most efficient, effective, and responsive manner."[35] And as to any water and sewer services provided by a county or municipality beyond its own boundaries, the strategy must ensure that "water or sewer fees charged to customers located outside the geographic boundaries of a service provider [are] not arbitrarily higher than the fees charged to customers receiving such service which are located within the geographic boundaries of the service provider."[36]

The scope of judicial review under the Service Delivery Strategy Act, then, is limited, and under it, a superior court is not authorized to decide that municipal water charges constitute an "illegal tax" simply because the municipality uses those charges for general revenue purposes. Importantly, the Act limits relief to specific remedies.[37] And as to judicial dispute resolution, under the Act, a superior court may "render a decision with regard to disputed items," hold statutory sanctions in abeyance pending

---

[35] OCGA § 36-70-24 (1).

[36] OCGA § 36-70-24 (2) (A).

[37] *See City of Union Point v. Greene*, 303 Ga. 449, 459 (2) (812 SE2d 278) (2018) (holding that trial court exceeded the scope of specific remedies made available by the Act), *disapproved of on other grounds by City of College Park v. Clayton Cnty.*, 306 Ga. 301 (830 SE2d 179) (2019).

completion of the dispute resolution process, use "its contempt powers to obtain compliance with its decision relating to the disputed items," and award costs against any party acting in bad faith.[38]

Thus, under the clear terms of the Act, a superior court's power to resolve "disputed items" is limited to disputes concerning the criteria for a service delivery strategy that are delineated in OCGA § 36-70-24.[39] The Act does not permit a county to challenge a municipal water charge as an "illegal tax" because of how a municipality uses the revenues. Indeed, as explained by the City of Valdosta in its amicus brief, OCGA § 36-70-24 (2) is "the only criterion that even pertains to municipal water charges, and it specifically authorizes a county only to seek judicial review of arbitrary rate discrimination between customers in the municipality and

---

[38] OCGA § 36-70-25.1 (d) (2); *see City of Union Point*, 303 Ga. at 457-48 (2) ("The trial court's power is limited to the abeyance or allowance of sanctions, its contempt authority, or the imposition of costs upon a finding of bad faith.").

[39] *See City of Union Point*, 303 Ga. at 457 (2) ("OCGA § 36-70-25.1 does not authorize the trial court to implement, in its own discretion, these broad, aspirational goals. Rather, the General Assembly provided criteria which 'shall be met' in developing the service delivery strategy, including those specifically prescribed in OCGA § 36-70-24 (3) (A) with respect to the matters in dispute here."); *see also* OCGA § 36-70-25.1 (b) ("If a county and the affected municipalities in the county *do not reach an agreement on a service delivery strategy*, the provisions of this Code section shall be followed as the *process to resolve the dispute*." (emphasis supplied)).

18

those outside the municipality."[40] As a result, even if the County can pursue declaratory relief in another proceeding, it is *not* entitled to do so in a proceeding under the Act. I disagree, then, with the majority and would reverse the trial court on this question as well.

For all of these reasons, I respectfully dissent.

---

[40] *See* OCGA § 36-70-24 (2) (A) ("The strategy shall provide that water or sewer fees charged to customers located outside the geographic boundaries of a service provider shall not be arbitrarily higher than the fees charged to customers receiving such service which are located within the geographic boundaries of the service provider."); OCGA § 36-70-24 (2) (B) ("If a governing authority *disputes the reasonableness of water and sewer rate differentials* imposed within its jurisdiction by another governing authority, that disputing governing authority may hold a public hearing for the purpose of *reviewing the rate differential*. Following the preparation of a rate study by a qualified engineer, the governing authority may *challenge the arbitrary rate differentials* on behalf of its residents in a court of competent jurisdiction. Prior to such challenge, the dispute shall be submitted to some form of alternative dispute resolution." (emphasis supplied)).